HENRY I. CHASE, Plaintiff in Error, *v.* ALEXANDER McDONNELL *et al.*, Defendants in Error.

### ERROR TO PEORIA.

A. being possessed of a farm on which were growing crops and a cabin, made an agreement with B. to move into the cabin and take care of the crops, and in due time to harvest them, and haul one-half of them to A.'s house or the railroad station, and to keep the other half as his compensation for this service. *Held,* that B. is not A.'s tenant, and had no title to the crops until after he had performed his part of the agreement.

PLAINTIFF in error sued defendants in error, to March term, 1859, of Peoria Circuit Court, in trover, for corn of plaintiff, converted by defendants to their use. Damages laid at $800.

Plea: general issue and joinder.

Cause tried at November term, 1859, before said court and a jury ; verdict and judgment for defendants.

The bill of exceptions shows that plaintiff, to sustain the issues on his part, called, first,

*Duncan J. Perry,* who said : I know parties to suit, and land of plaintiff, rented to Peter Duffy, in 1858. Was present when Duffy surrendered farm and crops to Chase. This was about

last day of July, or early part of August, 1858. Duffy was paying cash rent, and owed for rent of 1858, and some for previous rents. Plaintiff agreed to pay Duffy for a shanty on the land, and give up all claim for rents; and Duffy gave up to Chase the farm and all crops on it, except some potatoes, which he saved for himself, and was to surrender the shanty in a few days. These crops consisted of some wheat in shock, and about forty acres of growing corn. At same time plaintiff contracted with Hugh Winn to go on the place, thresh the wheat, take care of and harvest the corn, deliver one-half of each to plaintiff, at Langdon Station, or at residence of plaintiff, as plaintiff should direct, and for so doing Winn was to have the other half. Winn to occupy shanty, when Duffy went out.

Winn was not in on same terms as Duffy. Duffy was to pay cash rent, Winn to have half the crops, as stated. The contract of sale by Duffy and Chase, and between Chase and Winn, were made the same day, the latter just after the former, Winn and Duffy being present at each contract.

*Hugh Winn,* called, said: I was present when Duffy gave up farm and crops to Chase. This was in latter part of July, or first of August, 1858. The wheat was in shock at this time. Duffy owed Chase rents, and agreed to give up corn on ground, and wheat, to pay them. Chase was to give Duffy $20 for the shanty. I carried the money for Chase to him a day or two after. Duffy left the next week. I took possession under a contract with Chase, by which I was to take charge of place, tend and harvest the corn, thresh the wheat, and deliver one-half of each to Chase, at his residence, or at Langdon, as Chase might direct, and for doing this I was to have the other half. There were forty acres of corn. I had husked and gathered from 500 to 600 bushels of the corn, which I had in pens on the place. There were still in the field, ungathered, from 200 to 300 bushels, when my horse died, and I became unable to fulfil my contract, and deliver the corn. I had fed about 100 bushels of the corn. I told Chase I could not fulfill my contract, and he came out and I gave up the remaining corn and my contract to him, and Chase put me in possession to take care of the property for him. This was a week or two before Christmas. Some time in first week of January next, defendants came to premises with six teams and sixteen or seventeen men, carried off a part of the corn I had gathered, and gathered and carried off part of the corn in the field. They tore down the fence I had built, and put the corn they left in another pen on the land. They did not gather the corn clean, and left some parts of rows ungathered, and considerable scattered about upon the ground. Some people came next day, gathered and

carried away a good many sacks of corn that defendants had left in field. I do not know, certainly, how much corn defendants carried away. They said they took half of it. When defendants came, I forbid them taking the corn. Told them it was not mine—that I had given it all up to Chase because I could not deliver it as I had agreed, which was true. I did not stay till defendants divided the corn, but went to find Chase.

I had turned the crops over to Chase and given up contract, a week or two before Christmas, and before defendants took the corn away. I had not delivered any of the corn to Chase. I surrendered to Chase because my horse died, and I could not deliver it. I had till the 1st of March, 1859, to complete delivery. Was to have one-half of corn for taking care of it, and deliver the other half to Chase. Witness understood from time he made the contract, that he had right to sell, or mortgage his half of crops.

*George W. Odell, C. J. Jones,* and *James Elson,* being here called, testified that corn was worth from seventy-five to eighty cents per bushel in January, 1859, in Peoria.

*Shehan,* called, said : It was worth twelve and a half cents per bushel to shell and haul it from this farm to Peoria.

*Winn* said, corn was worth fifty cents per bushel, or more, at said farm, when defendants took this corn away.

Defendants called *John Kelly,* who said : I was present when Winn and Chase made contract about crops on Duffy farm. It was the last of July or beginning of August, 1858. Winn was to have one-half for tending and delivering the other half at Chase's house, or Langdon Station. Winn was in possession a few days afterwards—had charge of whole crops and farm. I saw some of the corn in pens after it was husked. Saw Chase's man hauling some away, after defendants had carried away what they took. I supposed Winn was in as tenant. I was present ; heard the contract between Duffy and Chase, and Winn and Chase. The latter was made just after the former. The same persons were present at both. Winn was to take Duffy's place as I understood, take care of the farm, keep up fence, take care of and harvest crops, deliver one-half where Chase desired, either at Chase's house or Langdon Station, for the other half, and to occupy house where Duffy was living.

*David Wendell,* called, said : I was present when defendants took away corn. It was in fore part of January last. It was taken from N.W. 29, T. 11 N., R. 6 E., in Peoria county. They had several teams. Some moved the corn in the pens, and some gathered what was in the field. I divided it for them. I first put out 100 bushels to offset what Winn had used, and divided the rest as nearly equally as I could. Corn was worth

about forty-five cents per bushel at farm at this time. About three weeks after defendants took the corn, I carried a written notice to Chase, from defendants, which run as follows:

*Princeville, January 24th,* 1859.

"MR. HENRY I. CHASE: We, the undersigned, are ready to deliver your part of corn, according to Hugh Winn's contract, at the Langan Depot, which was raised on the N.W. quarter of section 29, twenty-nine, 11 N., 6 E.

ALEXANDER McDONNELL.

JOHN NELSON."

Witness here produced notice, and defendants were permitted by the court to read the same in evidence, to the jury, against the objection of plaintiff. Witness further stated: When said notice was given to Chase, he appeared to get angry, said little, but I understood from him that he did not recognize defendants in the matter, and would have nothing to do with them.

Defendants next offered, in evidence, the following note:

$217.35. *Peoria, Illinois, Sept. 13th,* 1858.

Six months after date, for value received, we, or either of us, promise to pay to Robert Arthur Smith, or order, the sum of two hundred and seventeen 35-100 dollars, with interest at ten per cent. from date, if not paid when due.

(Signed) HIS

HUGH × WINN.

HIS MARK

WITNESS—EDWARD × GRANT, *for Winn.* ALEX. McDONNELL.

MARK

JOHN NELSON.

Also, a chattel mortgage upon the following property, to wit: One-half of forty acres of corn, the same in dispute. Two-thirds 27 acres corn on section 1, Brimfield township. One bay horse, one sorrel mare, dun pony, set double harness. Three plows, and a shovel plow. Forty bushels wheat in pen. Dated September 16th, 1858, and acknowledged, and recorded October 2nd, 1858. Said mortgage purports to be given to secure defendants against their liabilities, as securities of Winn on said note, and provides for possession of goods by Winn till default, or till Winn shall attempt to sell the property without the consent of defendants.

Defendants, at same time, called Hugh Winn and J. Armstrong, who proved the execution of said note, and that said mortgage was made to secure it. Plaintiff objected to the reading of said note and mortgage, in evidence—court overruled objection.

*Hugh Winn,* again called by defendants, said: I sold two loads of the corn, mentioned in said mortgage, which grew on the land in Brimfield. This is all I sold, or offered to sell, of the mortgaged goods. I sold these loads to get myself a stove,

and with consent of defendants. They knew I needed a stove, and told me to sell some of the corn and get one with the price, which I did. When I gave the mortgage to defendants, I told them how the matter stood between myself and Chase. That I was to harvest the corn and deliver one-half to Chase, as above stated, and for so doing, was to have the other half. I told Chase of the mortgage when I gave up the contract to him. Chase said he did not care for that; that I did not own the corn till I had complied with my contract, and had no right to make such mortgage. Before taking the corn, defendants took the horses, harness and one of the plows, mentioned in the mortgage. I paid $150 for one of the horses. It has since been sold for $100. One of the others was worth $50 to $60, and the pony was worth $40 to $50, when taken and sold by defendants.

This was all the evidence in the case.

Judgment was given for defendants.

J. K. COOPER, for Plaintiff in Error.

McCOY & HARDING, for Defendants in Error.

CATON, C. J. Chase being possessed of a farm on which were growing crops, and a cabin, made an agreement with Winn to move into the cabin and take care of the crops till they ripened, and then to harvest them, and haul one-half of the product to the plaintiff's house, or to the railroad station, and take the other half as his compensation for this service, and the whole case is resolved into the question whether Winn acquired an interest in the crops as they stood upon the ground, or before he had fully performed on his part. We do not see how it is possible to give more than one answer to this question. There is nothing like the relation of landlord and tenant here shown. Winn became the servant of Chase for the performance of a particular service, and not his tenant. He was to be paid in a particular way, but this gave him no present title to the specific pay agreed upon, any more than it would were he to have been paid in a horse, or in money. In either event he was bound to perform the service before he was entitled to demand his pay. Long before that was done, Winn found himself unable to perform, and by the mutual agreement of the parties, the contract was rescinded. The title to the entire property was all the while in the plaintiff, without a vestige of it ever having been in Winn. We think the plaintiff was undoubtedly entitled to recover for the trespass committed by the defendants. The judgment is reversed, and the cause remanded.

*Judgment reversed.*